UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HEIDI GILMORE; and JASON GILMORE,

                              Plaintiffs,                      3:15-CV-0686
                                                             (GTS/DEP)

v.

EVE BOUBOULIS, in her individual and
official capacity as Commissioner for the Otsego
County Department of Social Services; MERRITT
HUNT, in his individual and official capacity as
Investigator for the Otsego County District
Attorney's Office; JOHN M. MUEHL, in his
individual and official capacity as Otsego County
District Attorney; and OTSEGO COUNTY,

                              Defendants.
_____

APPEARANCES:                                OF COUNSEL:

LEGAL SERVICES OF CENTRAL        DENNIS A. KAUFMAN, ESQ.
NEW YORK                              SAMUEL C. YOUNG, ESQ.
  Counsel for Plaintiffs                 WILLA S. PAYNE, ESQ.
472 South Saline Street, Suite 300
Syracuse, New York 13202

LAW FIRM OF FRANK W. MILLER      FRANK W. MILLER, ESQ.
  Counsel for Defendants              CHRISTOPHER MILITELLO, ESQ
6575 Kirkville Road
East Syracuse, New York 13057

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

       Currently before the Court, in this civil rights action filed by Heidi Gilmore and Jason

Gilmore (collectively, "Plaintiffs") against Otsego County and three of its employees

(collectively, "Defendants"), is Defendants' motion for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c) (Dkt. No. 13) and Plaintiffs' cross-motion for leave to file an Amended

Complaint pursuant to Fed. R. Civ. P. 15(a) (Dkt. Nos. 33-34). For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiffs' cross-motion is granted in part and denied in part.

## I.     RELEVANT BACKGROUND

### A.     Plaintiffs' Complaint

Generally, Plaintiffs' Complaint alleges as follows.

#### 1.     Otsego County's Investigation and Prosecution of Welfare Fraud Cases

Defendant Eve Bouboulis ("Bouboulis") is Commissioner of the Otsego County Department of Social Services ("DSS"), and Defendant John Muehl ("Muehl") is the Otsego County District Attorney ("OCDA"). (Dkt. No. 1 at ¶¶ 7-8 [Plfs.' Compl.].) DSS and the OCDA are signatory to a written agreement, the Investigative Unit Operations Plan ("IUOP"), pursuant to which DSS delegated to the OCDA "the responsibility for investigating and prosecuting alleged welfare fraud in Otsego County." (*Id.* at ¶¶ 8-9; *accord,* Dkt. No. 1 at 31-62 ["Exhibit A"].)[1] Defendant Merritt Hunt ("Hunt") is a police officer and an investigator in the OCDA's Special Investigations Unit ("SIU"), the unit tasked with investigating and prosecuting alleged welfare fraud under the IUOP.[2] (*Id.* at ¶ 10.)

_____

[1]     References to Plaintiffs' Complaint by pagination refer to the pagination generated by CM/ECF, rather than the non-consecutive pagination reflected in the exhibits to Plaintiffs' Complaint.

[2]     The Court notes that, although Plaintiffs' Complaint refers to Exhibit A thereto generally as the "IUOP," the first page of Exhibit A is titled simply "AGREEMENT," dated January 14, 2014, and references terms reflected in numerous exhibits attached to the "AGREEMENT." (Dkt. No. 1 at 32.) "Exhibit B" to that document is itself titled "Investigative Unit Operations Plan" and provides, among other things, that OCDA's Special Investigations Unit is "responsible for the investigation and prosecution of allegations of client fraud" with

Under the terms of the IUOP, the SIU (comprised of an assistant district attorney, three "DA investigators," and a "DSS clerk") is "[t]he organizational unit responsible for the investigation and prosecution of allegations of client fraud," including, among other things, investigation of "Intentional Program Violations" ("IPV") and performance of "front end detection visits." (Dkt. No. 1 at 41.) With respect to how allegations of possible fraud are processed, the IUOP further provides that

> [a]llegations made to the Department are reported to the SIU by written complaints by the public, written referral by staff and phone contacts directly to the Unit. Determinations are made by SIU through research and interviews of all pertinent parties. Information gathered is reviewed with the District Attorney and a decision made as to the disposition of the compliant; i.e.: unsubstantiated, IPV, inadvertent Household Error, Disqualification Consent Agreement and/or prosecution.

(*Id.*)

## 2. Plaintiffs' Employment and Application for Benefits

Plaintiffs, who are husband and wife, have four children and reside in Otsego County, New York. (Dkt. No. 1 at ¶¶ 5-6 [Plfs.' Compl.].) At all times relevant to Plaintiffs' claims, Plaintiff Jason Gilmore ("Mr. Gilmore") worked full-time at a retail store, and Plaintiff Heidi Gilmore ("Mrs. Gilmore") was a stay-at-home mother. (*Id.* at ¶¶ 59-60.) Mrs. Gilmore also "occasionally generat[ed] additional income" by selling jewelry that she made on a "craft website," Etsy. (*Id.* at ¶ 60.) The time that Mrs. Gilmore committed to jewelry making "fluctuated unpredictably," but, when "actively engaged in" jewelry sales through Etsy, Mrs. Gilmore reported her income to DSS. (*Id.* at ¶¶ 62-63.)

---

respect to "Temporary Assistance, Safety Net Assistance, Food Stamps, Medical Assistance, Child Care Subsidy, and Intentional Program Violations[.]" (*Id.* at 38.) For the sake of clarity, and consistent with Plaintiffs' Complaint and the parties' memoranda of law, unless otherwise noted, the Court refers to these documents generally as the "IUOP."

"During the first part of February" 2014, Mrs. Gilmore "sporadically worked on" completing an application for Supplemental Nutrition Assistance Program ("SNAP") benefits (i.e., food stamps)[3] for Plaintiffs' family.  (*Id.* at ¶¶ 65-66.)  Plaintiffs did not have internet access at home, and so Mrs. Gilmore submitted a paper application for SNAP benefits.  (*Id.* at ¶¶ 67-68.)  At the time of submission, Plaintiffs had two sources of income, both of which Mrs. Gilmore included on the SNAP application: (1) Mr. Gilmore's employment income, and (2) child support that was "supposed to" total $50 per month, but that was not "always reliably paid."  (*Id.* at ¶ 69.)

After she submitted the application, but before the end of February 2014, Mrs. Gilmore "obtained internet access" and was able to "re-open her Etsy account and resume trying to sell jewelry when time permitted."  (*Id.* at ¶ 70.)  Her income from selling jewelry "fluctuated and was not reasonably certain."  (*Id.*)  In any event, however, the "countable income generated by" Mrs. Gilmore's jewelry sales never raised Plaintiffs' household income above 130% of the federal poverty level (i.e., an amount that would have required Plaintiffs' household to report a change in income during their benefit certification period).  (*Id.* at ¶¶ 31-32, 71.)  Mrs. Gilmore "made numerous attempts to both report and obtain reporting worksheets during the certification period," although Plaintiffs "had no legal duty to report any of the income she generated."  (*Id.* at ¶ 72.)

---

[3]       *See* 7 U.S.C. §§ 2013(a) ("[T]he Secretary [of Agriculture] is authorized to formulate and administer a supplemental nutrition assistance program under which, at the request of the State agency, eligible households within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment . . . .").

### 3. Mrs. Gilmore's July 2014 Meeting with Hunt

In or around July 2014, Mrs. Gilmore received a letter from Hunt, bearing OCDA's letterhead, that advised her that DSS "has referred [her] file to" OCDA and directed her to appear on July 9, 2014, to meet with OCDA investigators. (*Id.* at ¶¶ 73-74; *accord*, Dkt. No. 1 at 74 ["Exhibit D"].) Mrs. Gilmore appeared at the meeting as directed, and Hunt asked her if she knew why she had been summoned. (*Id.* at ¶¶ 10, 76.) Mrs. Gilmore responded that "she thought she needed to provide tax return documents and her income from the first half of 2014 because she had difficulty reporting it to the agency," and she "explained [her] attempts to" submit self-employment worksheets. (*Id.* at ¶¶ 76-77.) Mrs. Gilmore provided Hunt with requested income documentation and "expressed concern over why she was there and what would happen to the benefits that were on their card." (*Id.* at ¶¶ 78, 80.) Hunt instructed her to "spend what [she received] in Food Stamps because they will not be able to take them back once they are put on your card." (*Id.* at ¶ 80.)

### 4. Investigation of Plaintiffs' Employment Income

At some point after the meeting, Hunt called Mrs. Gilmore and requested "a monthly breakdown of her income received in 2014," and, although she had already provided income information during the meeting, Mrs. Gilmore provided the accounting of her income as requested. (*Id.* at ¶¶ 81-82.) Thereafter, on September 4, 2014, Hunt submitted a "Request for Action/Services" form to DSS, requesting assistance from DSS "to determine if the income provided by Mrs. Gilmore resulted 'in an overgrant.'" (*Id.* at ¶ 83; *accord,* Dkt. No. 1 at 76 ["Exhibit E"].) DSS determined that Plaintiffs received an overpayment of benefits in the amount of $1,045. (*Id.* at ¶ 85; *accord,* Dkt. No. 1 at 80 ["Exhibit G"].)

### 5. Plaintiffs' November 2014 Meeting with Hunt

In November 2014, Plaintiffs received another letter from the OCDA "that mirrored" the letter from June 2014 but was addressed to both Plaintiffs. (*Id.* at ¶ 87.) The letter stated that Plaintiffs' "file" had been "referred from [DSS] to the [OCDA's] office for investigation." (*Id.* at ¶ 88.) Moreover, the letter directed Plaintiffs to appear for a meeting with OCDA investigators on November 19, 2014, and stated that the failure to respond to the letter "may result in your arrest and subsequent prosecution" and that no children were permitted to accompany Plaintiffs to the appointment. (*Id.* at ¶¶ 89-91.) The letter did not advise Plaintiffs that they could "bring a lawyer or other representative with them to the meeting" or indicate "the reasons for the investigation or the reason for the proposed meeting[.]" (*Id.* at ¶¶ 92-93.)

On November 19, 2014, Plaintiffs attended the meeting as directed. (*Id.* at ¶ 95.) When they are arrived, Plaintiffs were ushered through a metal detector and eventually escorted to a small office where they met with Hunt behind a closed doorf. (*Id.* at ¶¶ 98-100.) Hunt asked Plaintiffs "if they could tell him why they were there," and, on the desk in front of Plaintiffs, Mr. Gilmore recognized a document pertaining to his employment earnings that reflected that a check was issued to him in the amount of $1,800. (*Id.* at ¶¶ 103-04.) Mr. Gilmore stated that, if the meeting concerned that "employer statement," he could provide Hunt with "an updated sheet and check" that would establish that the check was a clerical error and that he never received a check for $1,800. (*Id.* at ¶ 104.) Hunt stated that Mr. Gilmore's "income was not the reason for the meeting," but that Plaintiffs "were being charged with welfare fraud because 'they had received more food stamps than they were due.'" (*Id.* at ¶¶ 105, 109.)

When they learned that they "were being charged with fraud," Plaintiffs "were terrified." (*Id.* at ¶ 112.) Hunt then referred Plaintiffs "to [an]other document on the table," which was a

Disqualification Consent Agreement ("DCA"), and informed Plaintiffs that "they needed to sign the DCA and pay back the benefits they received." (*Id.* at ¶¶ 52-53, 113.) The DCA stated that Plaintiffs were overpaid SNAP benefits in the amount of $1,045 based on Mrs. Gilmore's "fail[ure] to report self employment income." (*Id.* at ¶ 114; *accord,* Dkt. No. 1 at 82 ["Exhibit H," Plaintiffs' DCA, which states, in part, that "Heidi Gilmore failed to report self employment income on SNAP application dated 2/24/14 which resulted in the receipt of benefits to which the household was not entitled for the period of 2/1/14 - 7/31/14."].) Hunt stated to Plaintiffs, "I don't think you intentionally committed fraud but since I can't verify your story you need to sign this paper." (Dkt. No. 1 at ¶ 115.)

Mrs. Gilmore asked if Plaintiffs "could speak to a third party to resolve the matter," or if they could "appeal," and Hunt responded that, although Plaintiffs "could call the DA," there was "no reason to" do so because "nine times out of ten they win these cases" and Plaintiffs were "better off if they just sign[ed] the papers." (*Id.* at ¶ 117.) Hunt stated that, if Plaintiffs refused to sign the DCA that day, he would call the OCDA's office "and a warrant would issue for their arrest." (*Id.* at ¶ 119.) Hunt then "leaned back in his chair and put his arms up [and] behind his head," and Plaintiffs observed that Hunt "was armed with a gun." (*Id.* at ¶ 118.)

Mr. Gilmore "felt helpless and angry" because Hunt had not provided Plaintiffs with any proof that they had committed fraud or "given them an opportunity to speak with an attorney." (*Id.* at ¶ 121.) However, if Plaintiffs refused to sign the DCA and were arrested, Mr. Gilmore feared that he would likely lose his job and the family would lose its home. (*Id.* at ¶ 120.) Moreover, if Mrs. Gilmore was arrested, Plaintiffs would have no childcare. (*Id.*) Mr. Gilmore stated that it appeared that Plaintiffs "would have no choice but to sign" the DCA, and Hunt

informed Plaintiffs that, if they did sign the DCA, "their kids would still receive SNAP" benefits. (*Id.* at ¶¶ 122-23.) Although they believed that they had not committed fraud, Plaintiffs signed the DCA. (*Id.* at ¶ 124.) Hunt gave Plaintiffs copies of the executed DCA as well as another document, the "Notice of Consequences of Disqualification Consent Agreement" ("Notice of Consequences") and escorted them to the exit. (*Id.* at ¶ 127.)

On the same date, DSS sent Plaintiffs a "Notice of Disqualification," informing them that they were disqualified from receiving SNAP benefits because they had consented to disqualification. (*Id.* at ¶ 128.) Soon thereafter, Plaintiffs also received a "Notice of Decision," informing that "the entire household was now ineligible for benefits due to being 'over income.'" (*Id.* at ¶ 130.) After they left the November 19, 2014, meeting with Hunt, Plaintiffs were "able to read through the DCA and Notice of Consequences for the first time," and learned that the DCA contained telephone numbers for "Legal Aid" and the public defender's office. (*Id.* at ¶ 132.) Hunt failed to inform Plaintiffs of these resources during the meeting. (*Id.*) Plaintiffs attempted to contact "Legal Aid" but eventually realized that the phone number was outdated. (*Id.* at ¶ 133.) Moreover, although DSS "updated the notices related to public assistance," DSS's "fraud notices" did not contain a correct address and telephone number for Legal Services of Central New York, Inc. (Plaintiffs' counsel in this case), rendering it difficult for Plaintiffs (as well as others faced with executing a DCA) to obtain legal assistance. (*Id.* at ¶ 134.)

On the advice of counsel, Plaintiffs requested a fair hearing in light of the fact that DSS' "procedures" did not conform with federal regulations, but DSS responded that Plaintiffs were not entitled to a fair hearing because they had signed the DCA voluntarily. (*Id.* at ¶ 136; *accord*, Dkt. No. 1 at 85 ["Exhibit I," Fair Hearing Summary].) Moreover, DSS "refused" Plaintiffs'

"numerous requests" for access to the evidence against them; it did not provide Plaintiffs with advance written notification of the consequences of consenting to disqualification as part of a deferred adjudication of welfare charges; did not provide Plaintiffs with the DCA for review 10 days prior their meeting with Hunt as required by law; and it "failed to take into consideration" the fact that Plaintiffs' household was "subject to six-month reporting rules" and thus had not improperly failed to report income. (*Id.* at ¶¶ 137-143.)

Based on these factual allegations, Plaintiffs assert the following six "Claims For Relief" (generally referred to herein as "claims"): (1) a claim pursuant to 42 U.S.C. § 1983 that Defendants violated several procedural requirements under SNAP's statutory provisions and 7 C.F.R. § 273; (2) a claim pursuant to 42 U.S.C. § 1983 that Defendants violated their procedural due process rights under the Fourteenth Amendment by, *inter alia*, requiring them to appear at meetings under the threat of arrest, failing to notify them of their right to be represented by an attorney, and obtaining their signature on the DCA without a knowing, voluntary, and intelligent waiver of their rights; (3) a claim pursuant to 42 U.S.C. § 1983 that Defendants violated their rights under the Fifth and Fourteenth Amendments, as well as *Miranda v. Arizona*, 384 U.S. 436 (1966), by subjecting them to a custodial interrogation and coercing them to unknowingly admit to an IPV without advising them of their right to counsel and right against self-incrimination; (4) a claim pursuant to 42 U.S.C. § 1983 that Defendants violated their right to counsel under the Sixth Amendment when proffering the DCA, which was "the functional equivalent of commencing prosecution"; (5) a claim that, for the same reasons cited in support of their procedural due process claim under the United States Constitution, Defendants violated their right to due process under Article I, § 6 of the New York State Constitution; and (6) a claim that

Defendants violated their rights pursuant to 18 N.Y.C.R.R., Parts 348 and 359, and New York

Social Services Law § 134-a.[4]  (Dkt. No. 1 at ¶¶ 146-76.)

With regard to relief, Plaintiffs seek, *inter alia*, the following: (1) a judgment declaring

that the "policies and practices employed by Defendants" in procuring the DCA from Plaintiffs

violated their federal and state constitutional rights, as well as "federal and state law and

regulations"; (2) an order enjoining Defendants from (a) unlawfully "disqualifying Plaintiffs or

other similarly situated individuals accused of SNAP fraud" and (b) "misusing" DCAs to

"illegally divest" Plaintiffs and other "accused individuals" of their right to disqualification

hearings under 7 C.F.R. § 273.16 and 18 N.Y.C.R.R., Part 359; (3) an order directing Bouboulis

to restore benefits that were "erroneously withheld" from Plaintiffs and to prospectively

determine their eligibility for SNAP benefits; (4) an award of compensatory damages in the

amount that they have already repaid pursuant to their repayment agreement, as well as for the

civil rights violations that they have suffered.  (*Id.* at 29, ¶¶ 2-6.)

**B.      Defendants' Motion for Judgment on the Pleadings**

Generally, in support of their motion for judgment on the pleadings, Defendants argue as

follows: (1) Plaintiffs' § 1983 claims must be dismissed as against Otsego County because

Plaintiffs have not alleged facts plausibly suggesting that their constitutional rights were violated

pursuant to an municipal policy, practice or custom (Dkt. No. 13, Attach. 1, at 7-9 [Defs.' Memo.

of Law]); (2) Muehl enjoys absolute immunity from suit because his actions (to the extent any

are alleged) were prosecutorial in nature (*id.* at 10-11); (3) Hunt enjoys absolutely immunity

---

[4]      Although Plaintiffs' Complaint refers to Social Services Law § 134(a) (which contains no subsection [a]), the Court assumes that Plaintiffs intend to refer to Social Services Law § 134-a.

from suit with respect to Plaintiffs' second, third, fourth, and fifth claims because his actions were prosecutorial in nature (*id.* at 11-13); (4) even if Hunt's actions were investigative in nature, he enjoys qualified immunity with respect to Plaintiffs' first and sixth claims because those claims do not allege violations of clearly established federal law (*id.* at 14-16); (5) Bouboulis enjoys qualified immunity because Plaintiffs do not allege facts plausibly suggesting that she took any action that violated established statutory or constitutional principles (*id.* at 16); (6) Plaintiffs' § 1983 claims as against Muehl and Bouboulis must be dismissed because Plaintiffs have not alleged facts plausibly suggesting that either was personally involved with respect to any of the conduct alleged in Plaintiffs' Complaint (*id.* at 16-18); (7) Plaintiffs' second and fifth claims (asserting due process violations) must be dismissed because no pre-deprivation relief was conceivable based on Plaintiffs' decision to execute the DCA rather than face potential prosecution for welfare fraud, and Article 78 of New York's Civil Practice Law and Rules provides an adequate state post-deprivation process by which Plaintiffs could have sought relief for Defendants' alleged failure to follow pre-deprivation procedures (*id.* at 18-22); and (8) Plaintiffs' fifth and sixth claims must be dismissed because they failed to timely file a notice of claim pursuant to New York General Municipal Law §§ 50-e and 50-i, and those claims are therefore not properly before the Court (*id.* at 22-23.)

### C. Plaintiffs' Opposition to Defendants' Motion and Plaintiffs' Cross-Motion for Leave to Amend Their Complaint

Plaintiffs oppose Defendants' motion for judgment on the pleadings and, in so doing, cross-move for leave to file an Amended Complaint, the well-pleaded allegations of which, Plaintiffs argue, cure any pleading defect in their original Complaint. (*See generally* Dkt. No. 34 [Plfs.' Opp'n Memo. of Law].) More specifically, Plaintiffs argue that (a) they should be

permitted to amend their Complaint to augment their factual allegations, particularly with respect to the individual Defendants' personal involvement and "the customs and policies . . . which gave rise to [Plaintiffs'] claims," and (b) Defendants will not suffer any resulting prejudice from the amendment. (*Id.* at 3-5.)

### 1. Plaintiffs' Proposed Amended Complaint

In their Proposed Amended Complaint ("PAC"), in addition to the factual allegations set forth in their Complaint, Plaintiffs allege as follows.

DSS is legally responsible for investigating cases of "intentional program violations under the SNAP program" in Otsego County under both federal and state regulations. (Dkt. No. 33, Attach. 4, at ¶ 146 [Plfs.' PAC].) The Commissioner of DSS delegated those investigatory responsibilities to the OCDA under the IUOP and a "DA Agreement,"[5] and Muehl and Bouboulis and/or their predecessors, "as final policymakers," executed the terms of those written agreements. (*Id.* at ¶¶ 147-48.)

While "[c]ounty social workers" are "trained in often complex federal and state regulations on benefit eligibility and reporting requirements," neither Hunt nor the other OCDA investigators "had an understanding of [f]ederal or [s]tate rules on reporting and self-employment income due to a deliberate lack of training by Otsego County." (*Id.* at ¶ 152.) By presenting Plaintiffs with the DCA, Hunt "was enforcing the DA Agreement and IUOP adopted as policy by Otsego County." (*Id.* at ¶ 153.) Moreover, by "promulgating, executing, and adopting" those written agreements, Muehl, Bouboulis, and Otsego County did three things: (1)

_____

[5] It is unclear to what Plaintiffs refer as the "DA Agreement," or if that document is distinct from the IUOP documents attached to their Complaint.

"authorized Investigator Hunt, rather than [DSS], to conduct the investigation into [Plaintiffs'] application for benefits"; (2) authorized Hunt to determine whether Plaintiffs' alleged error in reporting their income was merely inadvertent household error, agency error, or an IPV; and (3) sanctioned Hunt's "failure to give the DCA and notice of consequences . . . within a reasonable time frame before offering the DCA." (*Id.* at ¶¶ 154-56.) Otsego County, Muehl, and Bouboulis "intentionally or recklessly failed to provide adequate training and supervision to [OCDA] investigators," including Hunt, with respect to properly determining whether a SNAP applicant's or recipient's actions constituted inadvertent error, agency error, or an IPV. (*Id.* at ¶¶ 157, 168.) Muehl and Bouboulis were aware of, and condoned, Hunt's "unlawful practices," and, indeed, "all fraud allegations in Otsego County are resolved in the same manner as experienced by" Plaintiffs and thus suffer from the same procedural deficiencies. (*Id.* at ¶¶ 161-62, 165-67.) By "promulgating and adopting the policy," Defendants were deliberately indifferent to Plaintiffs' constitutional rights. (*Id.* at ¶ 170.)

With respect to their claims, Plaintiffs' PAC proposes to withdraw their third and fourth claims, asserting violations of their right to counsel and right against self-incrimination pursuant to the Fifth, Sixth, and Fourteenth Amendments, respectively. (Dkt. No. 33, Attach. 4.) Plaintiffs' do not seek to add any claims or parties.

### 2.    Plaintiffs' Arguments

In conjunction with their PAC, and in opposition to Defendants' motion for judgment on the pleadings, Plaintiffs argue as follows: (1) they have adequately alleged the existence of a municipal policy, custom, or practice pursuant to which their constitutional rights were violated in three ways, specifically (a) the Otsego County Board of Representatives adopted the IUOP,

(b) Muehl and Bouboulis were policymakers with final policymaking authority, and their decision to enter into and execute the IUOP is sufficient to render Otsego County potentially liable for the violations asserted by Plaintiffs, and (c) it was "and may still be" the ordinary custom of DSS and OCDA to investigate welfare fraud in the same manner as that employed in Plaintiffs' case (Dkt. No. 34 at 5-10 [Plfs.' Opp'n Memo. of Law]); (2) neither absolute immunity nor qualified immunity precludes Plaintiffs from pursuing injunctive or declaratory relief as against the individual Defendants (*id.* at 10-11, 14); (3) Hunt and Muehl do not enjoy absolute immunity because they were engaged in investigatory actions rather than prosecutorial actions (particularly in light of the terms of the IUOP documents, which delegated investigatory responsibilities to the OCDA), and a prosecution had not yet commenced (*id.* at 11-13); (4) the individual Defendants do not enjoy qualified immunity with respect to Plaintiffs' first and sixth claims because the federal and state statutes cited, which govern the application and eligibility for food stamp benefits, are "hardly ambiguous" (*id.* at 14-18); (5) Muehl and Bouboulis were directly and personally involved in the violation of Plaintiffs' rights because (a) they were both policymakers with respect to "the official policies followed here," (b) Bouboulis "approved the investigation of the Gilmores and failed to place the proper contact information for Legal Services on the 'Notice and Consequences of the DCA,'" and (c) Muehl signed "the DA Agreement" and "approved of" the actions of Hunt and other OCDA investigators in pursuing the investigation (*id.* at 18); (6) Plaintiffs have adequately alleged a violation of their due process rights in that (a) SNAP benefits are a statutorily created entitled protected by the Due Process Clauses of the United States and New York Constitutions, (b) Defendants violated existing pre-termination processes as a matter of municipal custom and policy, and (c) under the

-14-

circumstances, CPLR Article 78 does not provide an adequate post-deprivation procedure because Plaintiffs' deprivations resulted from "unlawful policies and procedures," rather than "a random, unauthorized act of a governmental official" (*id.* at 19-21); and (7) Plaintiffs' failure to file a notice of claim with respect to their state law claims does not require dismissal of those claims because they primarily seek injunctive and declaratory relief, and their prayer for monetary damages is ancillary and incidental to the equitable relief sought (*id.* at 21-22).

D. **Defendants' Reply in Further Support of Their Motion for Judgment on the Pleadings and Opposition to Plaintiffs' Cross-Motion for Leave to Amend Their Complaint**

Generally, in their reply to Plaintiffs' opposition, and in their opposition to Plaintiffs' cross-motion, Defendants argue as follows: (1) Plaintiffs' cross-motion for leave to amend their Complaint should be denied because the PAC does not remedy the deficiencies in the original Complaint and amendment would therefore be futile (Dkt. No. 36 at 3-4 [Defs.' Reply Memo. of Law]); (2) Plaintiffs have not adequately pleaded a claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), based on a municipal policy, custom, or practice because (a) they have not alleged facts plausibly suggesting that (i) such a policy, custom, or practice existed, (ii) their alleged deprivations were caused by the policy, custom, or practice, or (iii) "the tactics they allegedly experienced" were employed with respect to "any other SNAP recipients suspected of" an IPV, (b) the IUOP "framework" documents do not support Plaintiffs' claims, and Plaintiffs do not connect their factual allegations to any provisions of those documents (*id.* at 4-5), and (c) the regulations cited by Plaintiffs do not proscribe DSS's delegation of investigatory duties related to welfare fraud to the OCDA (*id.* at 4-8); (3) Plaintiffs have not adequately pleaded a *Monell* claim based on a failure to train because (a) their allegations regarding the alleged failure to train Hunt

-15-

and other OCDA investigators is conclusory and does not satisfy the elements of such a claim, (b) their allegation that Hunt was not trained to determine whether an IPV occurred is undercut by the terms of the IUOP, which provide that social services employees (and not OCDA investigators) review "a suspect application" in the first instance, before it is referred to the SIU, and (c) they have not pleaded any non-conclusory facts from which it may be reasonably inferred that other welfare fraud cases were handled in the same manner as their case (*id.* at 8-11); (4) aside from their second claim (sounding in due process), Plaintiffs' claims do not assert a violation of their federal constitutional rights and thus are not actionable under § 1983 (*id.* at 11-12); (5) Plaintiffs have failed to allege facts plausibly suggesting that Bouboulis and Muehl were personally involved in their alleged constitutional deprivations, and Bouboulis was not signatory to the IUOP (*id.* at 12-13, 15-17); (6) Plaintiffs lack standing to obtain declaratory or injunctive relief under § 1983 because they have failed to allege facts plausibly suggesting that there is a likelihood that they will suffer future injury (i.e., the same allegedly coercive and deficient processes in connection with a SNAP IPV investigation) (*id.* at 13-15); (7) Muehl and Hunt enjoy absolute immunity from suit (*id.* at 16-17); (8) Plaintiffs have not alleged facts plausibly suggesting that Muehl or Hunt violated a declaratory decree such that declaratory relief might be available as against them (*id.* at 18-19); (9) Bouboulis and Hunt enjoy qualified immunity because the SNAP statutes and implementing regulations do not create a private right of action (*id.* at 19); (10) Plaintiffs have not alleged facts plausibly suggesting that they were deprived of procedural due process because (a) all of the allegations in Plaintiffs' Complaint and PAC relate solely to the conduct of Hunt and (b) they could have challenged the loss of SNAP benefits by way of a CPLR Article 78 proceeding (*id.* at 20-22); (11) Plaintiffs' state law claims must be

dismissed because (a) Plaintiffs' § 1983 claims grounded in the New York State Constitution and state regulations are subject to state law notice of claim requirements, and Plaintiffs failed to timely serve a notice of claim, and (b) Plaintiffs' assertions that the "primary purpose" of asserting their claims was to seek declaratory and injunctive relief, rather than monetary relief, is "self-serving and unconvincing" (*id.* at 23-24).

## II.     RELEVANT LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Judgment on the Pleadings

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases); *accord, Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Accordingly, the Court will review Defendants' motion under the standard applicable to a motion to dismiss.

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim.  *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  In the Court's view, this tension between

permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case).  On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court.  *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases).  For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits."  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003).  For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard.  *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atl. Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id*. at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Id*. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

### B.       Legal Standard Governing Motions for Leave to Amend

A motion for leave to amend a complaint is governed by Fed. R. Civ. P. 15, which states that leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993). Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend a complaint should be freely given in the absence of any apparent or declared reason to not grant leave to amend, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *See Foman*, 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous*., 608 F.2d 28, 42 (2d Cir. 1979); *Meyer v. First Franklin Loan Servs, Inc*., 08-CV-1332, 2010 WL 277090, at *1 (N.D.N.Y. Jan. 19, 2010) (Suddaby, J.).

"Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Block v. First Blood Assocs*., 988 F.2d 344, 350 (2d Cir. 1993) (citation omitted). "In determining what constitutes prejudice, [courts]

consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350 (citation and internal quotation marks omitted).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 333 (E.D.N.Y. 2013) (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 [2d Cir. 2002]). A proposed amendment is therefore not futile if it states a claim upon which relief can be granted. *See Annunziato*, 293 F.R.D. at 333 (citations omitted). As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman*, 371 U.S. at 182 (denial not abuse of discretion where amendment would be futile); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here . . . there is no merit in the proposed amendments, leave to amend should be denied").[6]

---

[6] The Court notes that two Second Circuit cases exist reciting the standard as being that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."

-21-

## C.    Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an

accurate understanding of the relevant points of law contained in the legal standards governing

Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in

this Decision and Order, which (again) is intended primarily for the review of the parties.  (*See*

*generally* Dkt. No. 13, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 34 [Plfs.' Opp'n Memo. of

Law]; Dkt. No. 36 [Defs.' Reply Memo. of Law].)

## III.    ANALYSIS

### A.    Whether Plaintiffs' PAC Alleges Facts Plausibly Suggesting that Defendants Violated Their Due Process Rights Pursuant to the Fourteenth Amendment of the U.S. Constitution and/or Article 1, § 6 of the New York State Constitution

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendants' memoranda of law.  (Dkt. No. 13, Attach. 1, at 18-22 [Defs.'

Memo. of Law]; Dkt. No. 36 at 20-22 [Defs.' Reply Memo. of Law].)  To those reasons, the

Court adds two points.

First, Plaintiffs' New York State constitutional due process claim–premised on nearly

identical factual allegations as their federal procedural due process claim–is brought to allege

constitutional violations that can be vindicated through more specific claims pursuant to the Fifth

---

*Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999); *accord, Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).  The problem with these cases is that their "rule out any possibility, however likely it might be" standard is rooted in the "unless it appears beyond doubt" standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which was "retire[d]" by the Supreme Court in *Twombly*, 127 S. Ct. at 1969.  *See Gomez*, 171 F.3d at 796 (relying on *Branum v. Clark*, 927 F.2d 698, 705 [2d Cir. 1991], which relied on *Conley*, 355 U.S. at 45-46).  Thus, this standard does not appear to be an accurate recitation of the governing law.

and Fourteenth Amendments and § 1983. *See Mesa v. City of New York*, 09-CV-10464, 2013 WL 31002, at *33 (S.D.N.Y. Jan. 3, 2013) (granting summary judgment as to state constitutional due process claim because, *inter alia*, "New York courts do not always hold that a self-executing provision of the state constitution supports a claim for damages" and plaintiffs had "asserted federal analogs of their state constitutional claims under § 1983" as well as state tort claims, each of which provide civil damage remedies) (citations and internal quotation marks omitted); *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, 111 F. Supp. 3d 459, 482 (S.D.N.Y. 2015) (explaining that "The New York Constitution's due process, equal protection, and free exercise protections are essentially coextensive with those provided by the federal Constitution," collecting cases, and "dismiss[ing] as redundant" plaintiffs' state constitutional claims "as well as their request for an injunction on state law grounds"); *Sherman v. Town of Chester*, 12-CV-0647, 2015 WL 1473430, at *14 (S.D.N.Y. Mar. 31, 2015) ("[T]here is no private right of action for violations of the New York State Constitution where, as here, alternative remedies exist pursuant to, for example, 42 U.S.C. § 1983 and Article 78."); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *17 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims.") (collecting cases); *see also Ken Mar Dev., Inc. v. Dep't of Pub. Works of City of Saratoga Springs*, 53 A.D.3d 1020, 1025 (N.Y. App. Div. 3d Dep't 2008) (dismissing equal protection claim brought under New York State Constitution because "the injunctive and declaratory relief available to petitioner pursuant to CPLR article 78 provides an adequate alternative remedy, rendering the recognition of a constitutional tort

unnecessary to effectuate the purposes of the State constitutional protections [petitioner] invokes") (citations and internal quotation marks omitted).

In this case, nowhere in their Complaint, PAC, or briefing on the pending motion or cross-motion do Plaintiffs argue, allege, or suggest that the Court must or should apply a different standard with respect to their New York State constitutional claim, or that the New York State Constitution affords relief that the sources underlying their other claims do not; moreover, the factual allegations in their Complaint in support of both their federal and state constitutional claims are substantially identical. (*Compare* Dkt. No. 1 at ¶ 153[a]-[d] *with* ¶ 172[a]-[d] [Plfs.' Compl.]; *compare* Dkt. No. 33, Attach. 4, at ¶ 178[a]-[d] *with* ¶ 197[a]-[d] [PAC].); *see also, e.g., DeMartino v. New York State Dep't of Labor*, 13-CV-5273, 2016 WL 843283, at *25 (E.D.N.Y. Mar. 1, 2016) ("Plaintiffs do not provide any reason why the court should apply a different due process analysis under the New York Constitution[, and n]owhere in their briefing do they submit that due process protections under the New York Constitution, as relevant here, exceed the protections available under the Due Process Clause of the Fourteenth Amendment."). The Court therefore concludes that, for this reason alone, Plaintiffs' claim asserting a violation of the New York State Constitution's due process clause should be dismissed.[7]

_____

[7]     Moreover, "[w]ith some exceptions, New York courts have interpreted the due-process guarantees of the New York Constitution and the United States Constitution to be coextensive–or assumed that they are." *Oneida Indian Nation of New York v. Madison Cty.*, 665 F.3d 408, 427 n.13 (2d Cir. 2011) (collecting cases, and further explaining that the Court "need not decide . . . whether Article I, section 6 of the New York Constitution provides any greater relief than does the Fourteenth Amendment . . . inasmuch as the OIN has not asserted that it is entitled to any greater due-process protection under state constitutional law than under federal constitutional law."). Plaintiffs advance no argument suggesting otherwise. Thus, even if the existence of a more appropriate, alternative remedy did not point in favor of dismissing

Second, "[i]n assessing a state or local government's compliance with procedural due process, [the Second Circuit] distinguish[es] between (1) claims based on established governmental procedures, and (2) claims based on random or unauthorized acts by public employees." *G.I. Home Dev. Corp. v. Weis*, 499. F. App'x 87, 88 (2d Cir. 2012) (summary order) (citing *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 [2d Cir. 2006]). The distinction is significant; "[i]n the former case, the government may have to provide a pre-deprivation hearing because it can predict when the deprivation of a liberty or property interest will occur," but, in the latter case, "defendants will satisfy procedural due process 'so long as [they] provide[] [a] meaningful post-deprivation remedy." *G.I. Home Dev. Corp.*, 499 F. App'x at 88 (quoting *Rivera-Powell*, 470 F.3d at 465).[8]

Defendants correctly argue, and Plaintiffs appear to acknowledge, that Article 78 of the CPLR provides an adequate post-deprivation procedure to satisfy the requirements of constitutional due process where the deprivation of a property interest, such as to SNAP benefits, arises from random and unauthorized conduct of a government actor rather than from established state procedures. (Dkt. No. 13, Attach. 1, at 18-19 [Defs.' Memo. of Law]; Dkt. No. 34 at 19

_____

Plaintiffs' state constitutional due process claim, the Court would conclude that, for the reasons explained herein, as well as those in Defendants' memoranda of law, Plaintiffs have failed to allege facts plausibly suggesting that their state constitutional rights were violated, for the same reasons that their federal constitutional due process claim fails.

    [8]    *See also Rivera-Powell*, 470 F.3d at 466 ("If we were to determine that the Board's conduct was random and unauthorized . . . the existence of a meaningful post-deprivation remedy . . . would automatically satisfy procedural due process. If, on the other hand, we were to find that the Board's decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not *automatically* satisfy due process, we would merely go on to determine what process was due.") (internal citations omitted).

[Plfs.' Opp'n Memo. of Law].)  *See also, e.g., McCluskey v. Comm'r of Nassau Cty. Dep't of Soc. Servs.*, 12-CV-3852, 2013 WL 4780954, at *13 (E.D.N.Y. Sept. 5, 2013) ("Article 78 is routinely the venue in which adverse food stamp determinations are challenged, often successfully.") (quoting *Banks v. Human Res. Admin.*, 11-CV-2380, 2013 WL 142374, at *3 [E.D.N.Y. Jan. 11, 2013]); *Davis v. Proud*, 2 F. Supp. 3d 460, 489 (E.D.N.Y. 2014) (noting that, "[i]f a New York applicant wishes to challenge the resolution of her application after a fair hearing, she must do so by bringing a proceeding in state court under Article 78 of the New York Civil Practice Law and Rules," and, "[m]oreover, under New York State Law, Article 78 is a form of proceeding available to compel public officials to comply with their responsibilities[]") (citations and internal quotation marks omitted); *Vapne v. Eggleston*, 04-CV-0565, 2004 WL 2754673, at *5 (S.D.N.Y. Dec. 1, 2004) (concluding that an Article 78 proceeding afforded plaintiff appropriate relief where, "[s]tripped of [its] conclusory constitutional allegations, all that remains of the complaint is a routine dispute over [the] amount of food stamp benefits issued by Defendants" (internal quotation marks omitted); *see generally Riano v. Town of Schroeppel*, 13-CV-0352, 2015 WL 4725359 at *4 (N.D.N.Y. Aug. 10, 2015) (D'Agostino, J.) ("New York State statutes provide an opportunity for full and complete judicial review of all administrative determinations. The availability of such judicial review satisfies the dictates of procedural due process.").  Indeed, Plaintiffs advance no argument that an Article 78 proceeding would be inadequate to satisfy their due process rights if the alleged violation of those rights resulted from the random and/or unauthorized acts of Hunt (or any other Defendant) in this case.

However, Plaintiffs appear to argue that they were deprived of SNAP benefits not merely as the result of the unauthorized acts of Hunt in their particular case, but as the result of

established County procedures for handling suspected cases of IPVs as embodied in the IUOP. (Dkt. No. 34 at 19-20; *accord,* Dkt. No. 33, Attach. 4, at ¶ 153 [Plfs.' PAC, alleging that, "(w)hen presenting the DCA to the Plaintiffs, Defendant Hunt was enforcing the DA Agreement and IUOP, adopted as policy by Otsego County"].)   The Court concludes that Plaintiffs have failed to allege facts plausibly suggesting a due process violation arising from established state procedures, and as a result, further concludes that an Article 78 proceeding would have afforded sufficient relief to satisfy constitutional due process requirements.

As an initial matter, the crux of Plaintiffs' due process claims is that the Defendants did *not* abide by state and federal procedures in securing the executed DCA and disqualifying Plaintiffs from receiving SNAP benefits for 12 months.  Indeed, in their opposition memorandum of law, Plaintiffs acknowledge that "[t]he processes in federal and state law and regulations exist."  (Dkt. No. 34 at 19.)  Plaintiffs do not argue that those provisions are inadequate, but rather argue that Defendants "chose[] to ignore" those "processes" rather than follow them.  (*Id.*)  *See generally Rios v. Town of Huntington Housing Auth.*, 853 F. Supp. 2d 330, 339 (E.D.N.Y. 2012) (denying motion for preliminary injunction and concluding that due process violation, as alleged, was the result of a "random and unauthorized act" where plaintiff's claim "boil[ed] down to an allegation that the [public housing authority] improperly decided that it was not going to be bound by the [hearing officer']s decision, in disregard of" federal regulations, a claim redressable in an Article 78 proceeding); *Chase Grp. Alliance LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 152 n.3 (2d Cir. 2010) (noting that plaintiffs' "complaint is at pains to emphasize that the purported imposition of a lien violated a Housing Court order," and thus that they "would have difficulty surmounting the argument that no pre-deprivation

notice and hearing was required because the deprivation was random and unauthorized").[9]

Moreover, the IUOP documents attached to Plaintiffs' PAC do not render plausible the PAC's factual allegations that Defendants violated their due process rights as a matter of County procedure (as opposed to random and/or unauthorized acts). Although Plaintiffs' due process claims are founded on the proposition that the IUOP purported to allow County officials to disqualify individuals' SNAP benefits without following the requirements set forth in SNAP statutory and regulatory framework, Plaintiffs neither cite to any provisions in the IUOP that expressly allow or endorse such conduct, nor allege facts plausibly suggesting that the IUOP *impliedly* permits or directs any of the Defendants, as a matter of procedure, to avoid complying with state or federal statutory and regulatory requirements for administering the SNAP program. On its face, the IUOP merely reflects the general terms by which the OCDA assumed the responsibility for, among other things, investigating reports of suspected IPVs as referred by DSS workers, in exchange for monetary compensation.[10]

Similarly, the Court concludes that Plaintiffs have not alleged facts plausibly suggesting that their due process rights were violated by "the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters'" (and thus that the conduct

---

[9]     The Court notes that Plaintiffs expressly *do not* argue that they were entitled to a pre-deprivation hearing. (Dkt. No. 34 at 20 ["Here, the Plaintiffs do not request a pre-deprivation hearing, but only demand that the Defendants follow existing federal and state procedural regulations during their investigation of a possible IPV."].)

[10]     To the extent that Plaintiffs may be understood to argue that the very act of delegating the investigation of suspected food stamp fraud to the OCDA SIU is improper (*see* Dkt. No. 33, Attach. 4, at ¶¶ 148-150), Plaintiffs identify no statute, regulation, or other authority suggesting that DSS may not delegate investigatory duties related to suspected IPVs (a crime) to law enforcement and/or a district attorney's investigation unit.

was not "random" or "unauthorized" for that reason). *Rivera-Powell*, 470 F.3d at 465 (quoting *Velez v. Levy*, 401 F.3d 75, 92-92 & nn.14 & 15 [2d Cir. 2005]). Other than Plaintiffs' conclusory allegations that Muehl, Bouboulis, and Otsego County "sanctioned . . . Hunt's" conduct in interacting with Plaintiffs by "promulgating, executing, and adopting the IUOP and DA Agreement" (Dkt. No. 33, Attach. 4, at ¶¶ 154-156), Plaintiffs' PAC contains no factual allegations plausibly suggesting that (a) Muehl or Bouboulis had any direct involvement whatsoever in Plaintiffs' case,[11] or (b) Hunt (an investigator who apparently reported to an assistant district attorney) was himself a high-ranking official with any final authority.

Finally, Plaintiffs' allegations that other cases of suspected IPVs in Otsego County were handled in the same manner as Plaintiffs' case are speculative and conclusory, and thus do not plausibly suggest that Plaintiffs' constitutional rights were violated as a matter of municipal procedure, as opposed to the random and/or unauthorized acts. (Dkt. No. 33, Attach. 4, at ¶ 165 ["On information and belief, all fraud allegations in Otsego County are resolved in the same manner as experienced by the Gilmores."].)

For all of these reasons, as well as those set forth in Defendants' memoranda of law, the Court concludes that Plaintiffs have not alleged facts plausibly suggesting that Defendants

---

[11] Plaintiffs' PAC alleges that Bouboulis failed to update Otsego County's "Notice of Consequences of Disqualification Consent Agreements" form to reflect "updated contact information" for Legal Services of Central New York (Dkt. No. 33, Attach. 4, at ¶ 163), but neither the Code of Federal Regulations nor New York's Code of Rules and Regulations impose such a requirement. *See* 7 C.F.R. § 273.16 (h)(1)(i)-(iii) (setting forth information to be included in advance notifications of "the consequences of consenting to a disqualification as part of a deferred adjudication"); 18 N.Y.C.R.R. § 359.4(b)(4) (providing merely that, "[i]f the prosecutor requests or authorizes a social services district to assist in obtaining a DCA," the "accused individual must *be advised that he or she may obtain* a legal or other authorized representative for counsel and advice prior to and at the time the DCA is executed . . . .") (emphasis added).

violated their due process rights under either the United States Constitution or the New York State Constitution.  Accordingly, Defendants' motion to dismiss Plaintiffs' second and fifth claims is granted and those claims are dismissed.

> **B.    Whether Plaintiffs' PAC Alleges Facts Plausibly Suggesting that Their Rights Were Violated Pursuant to a Municipal Practice, Custom, or Policy**[12]

After carefully considering this matter, the Court answers this question in the negative for the reasons set forth in Defendants' memoranda of law.[13]  (Dkt. No. 13, Attach. 1, at 7-9 [Defs. Memo. of Law]; Dkt. No. 36 at 4-12 [Defs.' Reply Memo. of Law].)  To those reasons, the Court adds two points, intended to supplement, and not supplant, Defendants' arguments.

First, with regard to Plaintiffs' argument that the IUOP constitutes a municipal policy adopted by Otsego County, and that the IUOP fails to explicitly "provide for" requirements set

---

[12]    Plaintiffs' claim is premised on the following alleged violations: (1) Defendants required Plaintiffs to "attend a face to face interview" with investigators, in violation of 7 U.S.C. §§ 2014(b) and 2020(e)(5), as well as 7 C.F.R. § 273.2(a)(1); (2) Defendants "failed to allow" Plaintiffs to designate a head of household for purposes of their SNAP benefits, in violation of 7 C.F.R. § 273.1(d); (3) Defendants coerced Mr. Gilmore into signing the DCA, even though he was not the individual accused of committing an IPV and was not the head of household, in violation of 7 C.F.R. § 273.16(b)(11); (4) Defendants wrongly held Plaintiffs' household accountable for a failure to report a change in household circumstances, even though it was a "six-month reporting household" and therefore not required to report the change at issue, in violation of 7 C.F.R. § 273.12; (5) Defendants "did not have the required sufficient documentary evidence to substantiate that" Plaintiffs' actions were intentional, rather than inadvertent, in violation of 7 C.F.R. § 273.16(a)(1); and (6) Defendants "failed to afford the Plaintiffs the procedural protections" required by 7 C.F.R. § 273.16(h) in securing their execution of the DCA, including advance written notice of the consequences of signing the DCA.  (Dkt. No. 33, Attach. 4, at ¶ 173[a]-[f].)

[13]    As discussed above, the Court has concluded that Plaintiffs have not alleged facts plausibly suggesting that Defendants violated their constitutional due process rights.  Even if Plaintiffs had adequately pleaded that claim, however, the Court notes that Plaintiffs' failure to allege facts plausibly suggesting the existence of a municipal policy, custom, or practice pursuant to which those violations occurred would provide an independent basis for concluding that Plaintiffs' § 1983 claims as against Otsego County must be dismissed.

forth in SNAP's implementing regulations (including that those accused of IPVs receive advance written notification of the consequences of consenting to disqualification from receiving benefits), the IUOP documents attached to Plaintiffs' Complaint and PAC do not plausibly suggest the existence of a policy that *caused* the violations alleged by Plaintiffs. On its face, the IUOP does not purport to reiterate every statutory and regulatory provision for local administration of the SNAP program, but rather sets forth the general terms by which the OCDA agreed to assume (and/or share with DSS) certain responsibilities, including those involving suspected IPVs.

Second, Plaintiffs' argument that Muehl and Bouboulis are policymaking officials with respect to prosecutions and social services, respectively, does not necessarily mean that there existed any County policy, custom, or practice pursuant to which the alleged violations occurred. *See, e.g., Jenkins v. Cty. of Washington*, 126 F. Supp. 3d 255, 279 (N.D.N.Y. 2015) (Suddaby, J.) (noting that plaintiff's allegation that individual defendants were policymaking officials "does not mean that there existed any County policy, custom or practice pursuant to which the alleged constitutional deprivations occurred"). In other words, the mere fact that, as policymakers, Muehl and Bouboulis entered into, and/or continue to abide by the terms of, the IUOP, does not plausibly suggest the existence of a policy that was the moving force behind the violations allegedly suffered by Plaintiffs.

Third, the Court finds that Plaintiffs' general allegations that, "[o]n information and belief, all fraud allegations in Otsego County are resolved in the same manner as experienced by the Gilmores" and that Muehl, Hunt, and Otsego County failed to adequately train and supervise Hunt and other OCDA investigators (Dkt. No. 33, Attach. 4, at ¶¶ 165, 167) are too speculative

and conclusory to plausibly suggest that the municipality acted with deliberate indifference in disregarding the risk of possible constitutional violations. *See generally W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 14-CV-8093, 2016 WL 1274587, at *11 (S.D.N.Y. Mar. 31, 2016) (concluding that plaintiffs failed to adequately plead municipal liability based on a failure to train where the amended complaint identified two other incidents, which were "isolated" and "factually dissimilar"); *see generally McLennon v. City of New York*, 14-CV-6320, 2016 WL 1089258, at *17 (E.D.N.Y. Mar. 18, 2016) (concluding that "general and conclusory allegation" that municipal defendants "failed to properly train NYPD officers 'knowing that such failures would result in Fourth and Fourteenth Amendment violations" insufficient to adequately plead municipal liability based on a failure to train); *Lapaix v. City of New York*, 13-CV-7306, 2014 WL 3950905, at *9 (S.D.N.Y. Aug. 12, 2014) (noting, with respect to a deliberate indifference claim, that "a Plaintiff cannot base a claim for a pattern of constitutional violations on one other incident and general allegations regarding discriminatory motivation.").[14]

---

[14]     In support of their argument, Plaintiffs assert that, according to DSS's Annual Report for 2013, "not one case of [an] alleged intentional program violation was handled by an Administrative Disqualification Hearing," and "[t]he vast majority of welfare fraud allegations were handled through the DCA process" under the "IUOP and DA Agreement." (Dkt. No. 34 at 9, citing http://www.otsegocounty.com/depts/dss/documents/2013annualreportfinal_12-13-14.pdf, at 13.) Plaintiffs argue that "[t]his is consistent with Otsego County's custom and practice of failing to provide notice to accused individuals of the allegations against them," as well as failing to "advise recipients of their rights regarding the DCA process[.]" (*Id.*) As of the date of this Decision and Order, the document cited by Plaintiffs was not available at the website address provided by Plaintiffs. However, even if the Court assumed the truth and accuracy of Plaintiffs' assertions in this regard (as well as the truth and accuracy of the report itself), and even if resort to the report cited was proper of purposes of opposing Defendants' motion for judgment on the pleadings, the Court could not conclude that this argument renders plausible Plaintiffs' speculative factual allegation that DSS/OCDA handle every investigation of suspected IPVs in a manner identical to the circumstances alleged by Plaintiffs.

In short, Plaintiffs do not allege facts plausibly suggesting that an Otsego County policymaker conducted, ordered, ratified, or turned a blind eye to any violations asserted by Plaintiffs. "To the contrary, Plaintiffs allege facts plausibly suggesting the occurrence of a single incident carried out by one or more individuals below the policy-making level. Such allegations are insufficient to make out a claim of municipal liability." *Kenefic v. Oswego Cty.*, 07-CV-0213, 2010 WL 2977267, at *24 and n.42 (N.D.N.Y. July 23, 2010) (Suddaby, J.) (collecting cases).

For these reasons, as well as each of those reasons set forth in Defendants' memoranda of law, the Court concludes that Plaintiffs have failed to allege facts plausibly suggesting the existence of a municipal policy, custom, or practice that was the moving force behind the statutory and regulatory violations to which they were allegedly subjected.[15] Accordingly, Plaintiffs' § 1983 claims as against Otsego County are therefore dismissed.

### C. Whether Plaintiffs' PAC Alleges Facts Plausibly Suggesting that Muehl and Bouboulis Were Personally Involved for Purposes of Their § 1983 Claim Predicated on Defendants' Violation of the SNAP Statutes and Implementing Regulations

After carefully considering this matter, the Court answers this question in the negative for the reasons set forth in Defendants' memoranda of law. (Dkt. No. 13, Attach. 1, at 16-18 [Defs.' Memo. of Law]; Dkt. No. 36 at 15-17 [Defs.' Reply Memo. of Law].) To those reasons, the Court adds two points.

-------

[15]    The Court notes that claims against individual defendants in their official capacities "are duplicative of . . . § 1983 claims against" municipality defendants, and "[w]here, as here, a plaintiff has 'fail[ed] to adequately allege a basis for municipal liability,' the court may dismiss th[ose] duplicative 'claims against the [i]ndividual [d]efendants in their official capacities[.]'" *Mastronardi v. Vill. of Hancock*, 13-CV-1281, 2016 WL 799326, at *3 n.2 (N.D.N.Y. Feb. 29, 2016) (Scullin, J.) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 205 n.4 [S.D.N.Y. 2013]).

First, with respect to Bouboulis, Plaintiffs' argue that Bouboulis "enact[ed]" and "carr[ied] out . . . official policies," and also "failed to place the proper contact information for Legal Services on the 'Notice of Consequences of the DCA.'" (Dkt. No. 34 at 18.) However, Plaintiffs do not allege facts plausibly suggesting the manner in which Bouboulis "carried out" any purported policy; she was not signatory to the IUOP documents and, in any event, as discussed above, those documents do not reflect a policy or agreement between DSS and OCDA that the investigation or prosecution of suspected IPV cases would be carried out in a manner that did not comply with federal or state statutes and regulations. Moreover, Bouboulis's alleged failure to update the contact information for "Legal Services" on the "Notice of Consequences" form used by Defendants, even if assumed to be true, is an insufficient basis upon which to find her personally involved; none of the regulations that Plaintiffs claim were violated impose a requirement that Bouboulis or Otsego County provide that information on the "Notice of Consequences" form, and Plaintiffs do not otherwise connect the failure to update the form to any harm they suffered.[16]

Second, with respect to Muehl, Plaintiffs allege only that Muehl signed the IUOP and "DA Agreement" which predated the conduct at issue here, "approved of" Hunt's actions in investigating Plaintiffs and undisclosed "other similar welfare fraud investigations," and issued the "policies and directives" that Hunt and other OCDA investigators followed "when they

---

[16]    In their PAC, Plaintiffs allege that Hunt's actions prevented them from being able to review the DCA and Notice of Consequences paperwork until after they had already executed the DCA (and thereby acknowledged wrongdoing). (Dkt. No. 33, Attach. 4, at ¶ 164.) It is therefore unclear how Bouboulis's (apparently earlier) failure to update the "Legal Services" contact information on the form rendered her personally involved in the violations resulting from Hunt's allegedly coercive conduct, or that this failure had any causal connection with the violations of which Plaintiffs complain.

proceeded to obtain a DCA from [Plaintiffs] and others" without, among other things, "giving

advanced notice" or the "basis for the allegations[.]" (Dkt. No. 34 at 18.) Once again, however,

it is unclear to what "policies and directives" Plaintiffs refer, and Plaintiffs do not allege facts

plausibly suggesting any logical connection between the IUOP documents and Hunt's conduct

with respect to Plaintiffs; these deficiencies render Plaintiffs' allegation that Muehl "was aware

of and approved, condoned or failed to correct [Hunt's] unlawful practices" a conclusory recital

of legal standards not supported by facts plausibly suggesting supervisory liability here. *See*

*generally Marom v. City of New York*, 15-CV-2017, 2016 WL 916424, at *18 (S.D.N.Y. Mar. 7,

2016) ("The [complaint], however, fails to plausibly allege how [an individual defendant] or the .

. . policy he allegedly created *caused* false information to be relied upon or recorded during of

Marom's or Roecek's arrests [for purposes of false arrest claims].").

For these reasons, as well as those reasons set forth in Defendants' memoranda of law, the

Court concludes that Plaintiffs have not alleged facts plausibly suggesting that Bouboulis or

Muehl were personally involved in the violations of which they complain. Accordingly,

Plaintiffs' § 1983 claims as against Bouboulis and Muehl are dismissed.[17]

**D.     Whether Hunt Enjoys Qualified Immunity with Respect to Plaintiffs' § 1983 Claim Predicated on Defendants' Violation of the SNAP Statutes and Implementing Regulations**

After carefully considering this matter, and based on the limited information before it, the

Court concludes that Defendants have not met their burden of establishing that a determination

partially disposing of Plaintiffs' first and sixth claims with respect to Hunt on the basis of

---

[17]     Because the Court concludes that neither Muehl nor Bouboulis were personally
involved in any of the violations of which Plaintiffs complain, the Court need not address their
further argument that they enjoy absolute immunity and/or qualified immunity.

qualified immunity is appropriate at this time. The Court reaches this conclusion for the following reasons.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [1982]); *accord, Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). "Two questions inform qualified immunity analysis." *Zalaski*, 723 F.3d at 388. "First, do the facts show that the officer's conduct violated plaintiff's [statutory or] constitutional rights?" Second, "was the right clearly established at the time of defendant's actions?" *Id.* "Addressing the latter question first is particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct 'was not objectively unreasonable in light of existing law.'" *Id.* at 389. As a general matter, "[f]or qualified immunity to bar suit at the motion to dismiss stage . . . the facts supporting the defense [must] appear on the face of the complaint[.]" *Holland v. City of New York*, 14-CV-5517, 2016 WL 3636249, at *5 (S.D.N.Y. June 24, 2016) (citation omitted); *accord, e.g., Kenney v. Clay*, 2016 WL 1156747, at *9 (N.D.N.Y. Mar. 23, 2016) (Hurd, J.).

Initially, the Court concludes that Hunt is not entitled to qualified immunity with respect to Plaintiffs' sixth claim, which is not asserted pursuant to 42 U.S.C. § 1983, but rather alleges violations of state law. "[A] violation of state law neither gives [plaintiffs] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Holland*, 2016 WL 3636249, at *12 (quoting *Doe v. Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868,

869 [2d Cir. 1990]); *accord, Mawhirt v. Ahmed*, 8 F. App'x 125, 127 (2d Cir. 2001) (summary order) ("Because a violation of state law is not cognizable under § 1983, the federal law doctrine of qualified immunity does not apply to state law claims[.]") (internal citations and quotation marks omitted).

With respect to Plaintiffs' first claim, Defendants argue in a conclusory manner that, "even if all the allegations are accepted as true, Defendant Hunt cannot have violated an established constitutional right of the Plaintiffs' under that claim" because Plaintiffs rely upon statutes and regulations that lack "constitutional dimension." (Dkt. No. 13, Attach. 1, at 15 [Defs.' Memo. of Law].) This argument oversimplifies the issue, however, because it is axiomatic that 42 U.S.C. § 1983 "creates a cause of action against any person who, acting under color of state law, abridges 'rights, privileges, or immunities secured by the Constitution *and laws*' of the United States." *Shakhnes v. Berlin*, 689 F.3d 244, 250 (2d Cir. 2012) (quoting 42 U.S.C. § 1983) (emphasis added). "Violations of *rights* thus give rise to § 1983 actions; mere violations of *laws* do not," *Shakhnes*, 689 F.3d at 250, and such rights may be created by federal statute. *See, e.g., Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) (summary order) (noting that, "[w]hen a federal statute creates a right enforceable through 42 U.S.C. § 1983, federal regulations 'may be relevant in determining the scope of the right conferred by Congress.'") (quoting *Shakhnes*, 689 F.3d at 251); *accord, Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002); *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).[18] Further complicating the

_____

[18]      In *Shaknes*, the Second Circuit noted that, "[a]s an agency interpretation of a statute, a regulation may be relevant in determining the scope of the right conferred by Congress," and applied the "rubric" set forth by the Eleventh Circuit in an earlier case:

> [S]o long as the statute itself confers a specific right upon the
> plaintiff, and a valid regulation merely further defines or fleshes

issue is the fact that the Second Circuit "has yet to determine whether a federal regulation, standing alone, can create a right enforceable via § 1983." *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 513 (2d Cir. 2006); *see also Shakhnes*, 689 F.3d at 250-51 & n.4 (collecting cases from other Circuit courts holding that regulations may not independently create rights enforceable under § 1983, but noting that "this observation is beside the point, because the [d]istrict [c]ourt did nto hold that *the regulation* here at issue independently creates a right enforceable under § 1983").  Defendants do not address these issues.  Nor do they argue in their memorandum of law that Plaintiffs' first claim (and their related factual allegations) fails to state a claim on which relief may be granted; and, with respect to their qualified immunity argument, they do not address with particularity any of the statutes or regulations relied upon by Plaintiffs. The Court concludes that, by essentially outlining the general standard governing qualified immunity and relying on the incomplete argument that the provisions cited by Plaintiffs do not have "constitutional dimension," Defendants have not established Hunt's entitlement to qualified immunity.

 Moreover, Defendants summarily argue for the first time in their reply brief (and, again,

---

 out the content of that right, then the statute–in conjunction with the regulation–may create a federal right as further defined by the regulation. . . .

 On the other hand, if the regulation defines the content of a statutory provision that creates no federal right . . ., or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, . . . the regulation is too far removed from Congressional intent to constitute a 'federal right' enforceable under § 1983.

*Shakhnes*, 689 F.3d at 251 (quoting *Harris v. James*, 127 F.3d 993, 1009 [11th Cir. 1997]).

only in the context of their qualified immunity argument) that "the SNAP Act and its implementing regulations do not afford a private right of action," and cite a single case for that proposition. (Dkt. No. 36 at 19 [citing *Trefry v. Tracy*, 14-CV-0044, 2014 WL 2154263, at *4-5 (D. Me. May 22, 2014)] [dismissing, for lack of subject matter jurisdiction, *pro se* plaintiff's claim that disqualification from food stamps based on the amount of household income was "unfair," in part because "the SNAP Act does not authorize this Court to exercise jurisdiction over Plaintiff's private action seeking a change in federal and state food stamp policy"].) Defendants further add, in a one-sentence footnote, that *Trefry* "appears to require dismissal of Plaintiffs' First Claim for Relief outright." (Dkt. No. 36 at 19 n.1.) The Court declines to reach Defendants' argument (which does not appear to be adequately supported)[19] because it was raised for the first time in Defendants' reply memorandum of law, foreclosing a response from Plaintiffs and preventing the issue from being more fully fleshed out. *See, e.g., Ditullio v. Vill. of Massena*, 81 F. Supp. 2d 397, 408-09 (N.D.N.Y. 2000) (McAvoy, C.J.) ("Defendant may not first raise arguments . . . in its reply papers because Plaintiff would not have a fair opportunity to respond.").

Finally, the Court cannot determine from the face of Plaintiffs' Complaint or PAC whether Hunt's actions were objectively reasonable for purposes of his qualified immunity argument, and Defendants do not argue that those actions were objectively reasonable. (*See generally* Dkt. No. 13, Attach. 1, at 14-15.) For example, Plaintiffs allege, *inter alia*, that Hunt

---

[19]  The Court will not linger on the fact that, contrary to Defendants' cursory argument, the Second Circuit has held that certain SNAP statutory provisions *are* enforceable by private of action under § 1983. *See Briggs v. Bremby*, 792 F.3d 239, 241-46 (2d Cir. 2015) (concluding that the time limits for allocating food stamps provided in 7 U.S.C. § 2020[e][3] and [9] are privately enforceable through lawsuits pursuant to § 1983).

coerced them to execute the DCA without sufficient evidence that a program violation was intentional, and "[t]he objective reasonableness of [Hunt's] acts depends in part on what information [he] had at the time." *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 793-94 (2d Cir. 2002) (vacating district court's judgment dismissing claims in part on qualified immunity grounds as "premature") (citation and internal quotation marks omitted).

Under all of the circumstances, the Court concludes that Defendants have not met their burden of demonstrating, from the face of the Complaint or PAC, that Hunt is shielded by qualified immunity with respect to Plaintiffs' first and sixth claims. Defendants' motion to dismiss on that basis is therefore denied.

### E. Whether Plaintiffs' PAC Alleges Facts Plausibly Suggesting that They Have Standing to Obtain Declaratory or Injunctive Relief with Respect to Their § 1983 Claims

After carefully considering this matter, the Court answers this question in the negative for the reasons stated in Defendants' reply memorandum of law. (Dkt. No. 36 at 13-15 [Defs.' Reply Memo. of Law].) To those reasons, the Court adds the following analysis.

On December 11, 2015, Plaintiffs filed a letter motion to strike Defendants' argument that Plaintiffs lack standing to seek injunctive and declaratory relief with respect to their § 1983 claims because, according to Plaintiffs, that argument was improperly raised for the first time in Defendants' reply brief. (Dkt. No. 38.) The Court denied Plaintiffs' motion, but noted that it would disregard Defendant's arguments and reconsider Plaintiffs' motion if the Court determined that Defendants' arguments were improperly interposed. (Text Order filed 12/11/15.)

Plaintiffs' point is well taken, and the Court frequently declines to consider arguments raised for the first time in reply papers. *See, e.g., supra*, Part III.C.3. of this Decision and Order. Here, the Court agrees with Plaintiffs that Defendants were on notice that Plaintiffs were seeking declaratory and injunctive relief, because those requests were included in the prayer for relief of their Complaint, but that Defendants did not assert their lack-of-standing argument until they filed their reply.[20]  (Dkt. No. 1.)  However, under the circumstances of this case (and with respect to this argument only), the Court concludes that reaching Defendants' argument is appropriate for the following reasons.

First, district courts have discretion to consider arguments raised for the first time in reply papers. *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005); *accord, Compania Del Bajo Caroni Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009) (summary order) ("A district court enjoys broad discretion (1) to consider arguments made for the first time in a reply brief [and] (2) to rely on evidence submitted with the reply papers[.]") (internal citations and quotation marks omitted); *Mateo v. Gundrum* , 10-CV-1103, 2011 WL 5325790, at *12 (N.D.N.Y. Aug. 30, 2011) (Lowe, M.J.), *adopted*, 2011 WL 5325794, at *1-2 (N.D.N.Y. Nov. 3, 2011) (Sharpe, J.).  As a corollary principle, it is axiomatic that "reply papers may properly address new material issues raised in

_____

[20]        The Court notes that, in their memorandum of law, Defendants advanced numerous procedural and substantive arguments in support of their motion to dismiss Plaintiffs' Complaint in its entirety.  In their opposition memorandum of law, Plaintiffs emphasized that they were seeking declaratory and injunctive relief in the limited context of arguing that, even if the individual Defendants were ultimately entitled to absolute and/or qualified immunity, they still should not be dismissed from the case because Plaintiffs' could still pursue their requests for equitable relief.  (Dkt. No. 34 at 10-11, 14 [Plfs.' Opp'n Memo. of Law].)  In their reply memorandum of law, in further supported of their qualified immunity argument, Defendants argued that Plaintiffs lacked standing to request that relief, in the context of  reiterating their arguments concerning the applicability of the doctrines of absolute and/or qualified immunity.

the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway*

*Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000)

(citations and internal quotation marks omitted).[21]  It is the rare case in which the Court finds it

appropriate to consider arguments first raised in a reply brief, but the Court has long-recognized

discretion to do so.

Second (and more important), the issue of standing is a "threshold issue" that goes to the

heart of whether a Court has subject-matter jurisdiction to grant the relief requested.  *Gary Allen*

*Green & Broadway Sound & Video, Inc. v. Jackson*, 36 F. App'x 663, 668-69 (2d Cir. 2002)

(summary order) (dismissing, *sua sponte*, claims for injunctive and declaratory relief for lack of

subject matter jurisdiction because plaintiff's arguments with respect to the likelihood of future

injury were too speculative); *see also Muntagim v. Coombe*, 449 F.3d 371, 376-77 (2d Cir. 2006)

(concluding, *sua sponte*, that plaintiff lacked standing, even though his "failure to establish

standing was not raised or discussed in the district court," and vacating prior opinions in the

case); *Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 698 n.5 (S.D.N.Y. 2014)

("Although Defendants raise their argument that Plaintiff lacks standing in their reply

memorandum, such that the Court need not consider it . . . the Court will do so here because it is

_____

[21]     Here, Defendants argue (in their letter response to Plaintiffs' motion to strike) that, in relying on their requested equitable relief to oppose Defendants' immunity arguments, Plaintiffs brought the issue of the propriety of that relief to the forefront, and Defendants countered that argument in their reply.  (Dkt. No. 39.)  The Court finds this argument tenuous, given that, again, Plaintiffs' request for equitable relief was set forth in their Complaint. Somewhat more persuasive, however, is Defendants' argument that, with their PAC, Plaintiffs have (in addition to relying upon their requests for equitable relief to oppose dismissal) attempted to augment their factual allegations regarding the existence of a municipal policy or practice of improperly handling food stamp applications and investigations, and thereby giving greater primacy to the appropriateness of declaratory and injunctive relief.  (*Id.*)  This does not, of course, alter the fact that Plaintiffs' sought equitable relief from the outset.

a jurisdictional issue, which must be addressed when 'it emerges from the record.'") (quoting *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 82 [2d Cir. 1996]) (internal citations and quotation marks omitted); *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 188 (2d Cir. 2012) (summary order) ("Standing is the threshold issue in every federal case[.]") (citation and internal quotation marks omitted).  Indeed, the Court has the authority, and duty, to reach this issue *sua sponte*, pursuant to Fed. R. Civ. P. 12(h)(3).

For each of these reasons, the Court exercises its discretion to consider Defendants' argument in their reply memorandum of law that Plaintiffs' lack standing to obtain declaratory and injunctive relief with respect to their § 1983 claims.  After carefully considering the matter, the Court accepts Defendants' argument that Plaintiffs' PAC does not allege facts plausibly suggesting a real and immediate threat of future injury, for the reasons stated in Defendants' reply memorandum of law.[22]  (Dkt. No. 36 at 13-14 [Defs. Reply Memo. of Law, citing, *inter alia*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983), and *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)]).  On that basis, the Court concludes that Plaintiffs' lack standing to seek declaratory or injunctive relief with respect to their § 1983 claims.

---

[22]     The Court notes that Plaintiffs' factual allegation that all food stamp investigations processed in Otsego County are handled in the same improper manner as their own (which, as discussed above, the Court does not find to have been plausibly pleaded) also does not provide them standing to seek declaratory and injunctive relief.  *See Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215, 232 (E.D.N.Y. 2014) (dismissing plaintiff's claims for declaratory and injunctive relief "because there is no allegation by the [p]laintiff that he will personally suffer future injury and because 'a plaintiff with no claim of his own lacks standing to assert the rights of others'") (quoting *Ribeiro v. Travis*, 00-CV-6763, 2001 WL 893366, at *3 [S.D.N.Y. Aug. 8, 2001]).

**F.** **Whether Plaintiffs State Law Claims Should Be Dismissed Because Plaintiffs' PAC Fails to Allege Facts Plausibly Suggesting that They Filed a Notice of Claim**

After carefully considering this matter, and under the circumstances of this case, the Court answers this question in the negative for the reasons stated in Plaintiffs' opposition memorandum of law. (Dkt. No. 36 at 21-22 [Plfs.' Opp'n Memo. of Law].) To those reasons, the Court adds the following analysis.

First, Defendants argue in their reply memorandum of law that "§ 1983 claims grounded in the New York State Constitution are tort claims for the purpose of analysis of [n]otice of [c]laim requirements," and that Plaintiffs have not disputed that proposition. (Dkt. No. 36 at 23.) Defendants' argument misses the point. "Clearly, a violation of state law is not cognizable under § 1983." *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985). Moreover, Plaintiffs do not dispute that New York's "notice of claim requirement applies not only to . . . negligence claims but also to . . . intentional tort claims and related claims for violation of state constitutional and statutory provisions." *Brooks v. Cty. of Nassau*, 54 F. Supp. 3d 254, 257 (E.D.N.Y. 2014) (collecting cases). Instead, Plaintiffs argue that the notice of claim requirement does not apply here because their requests for compensatory damages are incidental to their requests for equitable relief. (Dkt. No. 34 at 21-22 [Plfs.' Opp'n Memo. of Law].)

"In determining whether plaintiffs primarily seek equitable or monetary relief, the Court must 'consider the complaint in the light of all its allegations and its full scope and purport.'" *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 301 (S.D.N.Y. 2000) (quoting *Watts v. Town of Gardiner*, 90 A.D.2d 615, 615 [N.Y. App. Div. 3d Dep't 1982] ["It is well settled that a notice of claim is not required for an action brought in equity against a

municipality, where the demand for money damages is merely incidental to the requested injunctive relief and subordinate thereto."]).  Here, liberally construing Plaintiffs' Complaint, and for the reasons set forth in Plaintiffs' opposition memorandum of law, the Court cannot conclude that Plaintiffs were primarily seeking money damages such that the failure to file a notice of claim is fatal to their claim predicated on the violation of state statutory and regulatory provisions.  *People United for Children, Inc.*, 108 F. Supp. 2d at 301.

The Court's conclusion in this regard is informed by two additional considerations.  As an initial matter, while the Court has accepted Defendants' late-blossoming argument that Plaintiffs' PAC does not allege facts plausibly suggesting that they have standing to seek equitable relief for purposes of their § 1983 claims (*see, supra,* Part III.D. of this Decision and Order), Defendants have not argued that there is no basis on which Plaintiffs may have standing to seek equitable relief pursuant to their state law claims.  Moreover, Defendants have not argued that Plaintiffs have failed to state a claim upon which relief may granted with respect to their sixth cause of action (i.e., Plaintiffs' claim pursuant to state statutory and regulatory provisions).[23] Third, and finally, with regard to state law claims against an individual defendant in his or her individual capacity, "service of a notice of claim is not a condition precedent to the

---

[23]     With respect to their sixth claim, Plaintiffs assert that Defendants did the following: (a) impermissibly delegated all steps of the investigation of eligibility to the OCDA; (b) failed to "properly presume that Plaintiffs' alleged failure to report income" was inadvertent error; (c) failed to use the DCA only in cases involving deferred adjudication; (d) failed to provide Plaintiffs with the DCA and Notice of Consequences 10 days in advance of asking them to sign those documents; (e) failed to advise Plaintiffs of their right to counsel prior to, and at the time of, signing the DCA; (f) failed to "adhere to the required district procedures for investigating, referral and provision of evidence related to fraud investigations," including the requirement to "determine the existence of any mitigating facts or circumstances" and provide them to the OCDA; (g) used threats of force and false statements to obtain evidence; and (h) by failing to comply with these requirements, violated Plaintiffs' civil rights under New York Social Services Law § 134-a.  (Dkt. No. 1 at ¶ 176[a]-[h]; Dkt. No. 33, Attach. 4, at ¶¶ 201[a]-[h].)

commencement of an action against a county's employees or agents unless the county is required to indemnify the individual defendants." *Brooks*, 54 F. Supp. 3d at 258 (citation and internal quotation marks omitted) (concluding that "the parties have not adequately briefed the issue of whether the County has a duty to indemnify the defendant police officers as to specific state claims" and denying defendants' motion to dismiss plaintiff's individual capacity claims).  The parties have not briefed this issue and, under the circumstances, the Court declines to determine the issue on this alternative ground not addressed by the parties.

Accordingly, Defendants' motion to dismiss Plaintiffs' sixth claim on the ground that Plaintiffs failed to file a notice of claim is denied.

### G.    Whether Plaintiffs' Cross-Motion for Leave to File an Amended Complaint Should Be Granted

After carefully considering this matter, the Court answers this question in the affirmative, in part for the reasons stated in Plaintiffs' opposition memorandum of law.  (Dkt. No. 34 at 3-5 [Plfs.' Opp'n Memo. of Law].)  Defendants have not argued that they would be prejudiced by the amendment, and their conclusory reference to Plaintiffs' "undue delay" (Dkt. No. 6 at 3 [Defs.' Reply Memo. of Law]) is undercut by the fact that the parties have exchanged little discovery, and Plaintiffs' cross-motion–which was timely filed pursuant to U.S. Magistrate Judge David E. Peebles' Uniform Pretrial Scheduling Order–closely followed Defendants' pre-answer motion for judgment on the pleadings.  Moreover, the Court notes that Plaintiffs do not propose to add new claims or theories of recovery; to the contrary, Plaintiffs' PAC withdraws two of the six claims they asserted in their Complaint.

The question is whether Plaintiffs' proposed amendments are futile.  To the limited extent that Plaintiffs' claims survive Defendants' motion for judgment on the pleadings (and based on

the possibility that Plaintiffs' proposed additional factual allegations will serve to aid in crystallizing those claims), amendment is appropriate. However, to the extent that Plaintiffs' claims do not survive Defendants' motion for judgment on the pleadings, those claims are dismissed from Plaintiffs' Amended Complaint.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for judgment on the pleadings (Dkt. No 13) is **<u>GRANTED</u> in part and <u>DENIED</u> in part**; and it is further

**ORDERED** that Plaintiffs' cross-motion for leave to file an Amended Complaint (Dkt. Nos. 33-34) is **<u>GRANTED</u> in part and <u>DENIED</u> in part**; and it is further

**ORDERED** that, based upon Defendants' motion for judgment on the pleadings, the following claims are **<u>DISMISSED</u>**:

(1)  Plaintiffs' First Claim for Relief (asserting violations of SNAP statutes and implementing regulations) as to Defendants Otsego County, Bouboulis, and Muehl;

(2)  Plaintiffs' Second Claim for Relief (asserting a due process violation pursuant to the Fourteenth Amendment of the United States Constitution) in its entirety; and

(3) Plaintiffs' Fifth Claim for Relief (asserting a due process violation pursuant to Article I, § 6 of the New York State Constitution) in its entirety; and it is further

**ORDERED** that, based upon Plaintiffs' cross-motion for leave to file an Amended Complaint, and in accordance with Plaintiffs' Proposed Amended Complaint, the following claims are **<u>DISMISSED</u>** from this action:

(1)  Plaintiffs' Third Claim for Relief (asserting violations of the right against self-incrimination and the right to counsel pursuant to the Fifth and Fourteenth Amendments of the

United States Constitution) in its entirety; and

(2)  Plaintiffs' Fourth Claim for Relief (asserting a violation of the right to counsel pursuant to the Sixth and Fourteenth Amendments of the United States Constitution) in its entirety; and it is further

**ORDERED** that, as of the date of the filing of this Decision and Order, the following claims remain **PENDING** in this action:

(1) Plaintiffs' First Claim for Relief (asserting violations of SNAP statutes and its implementing regulations) as to Defendant Hunt only; and

(2) Plaintiffs' Sixth Claim for Relief (asserting violations of 18 N.Y.C.R.R., Parts 348 and 359 and New York Social Services Law § 134-a); and it is further

**ORDERED** that Plaintiffs shall, within **SEVEN (7) DAYS** from the date of this Decision and Order, file a revised, signed Amended Complaint that omits the claims dismissed by, and asserts only the claims permitted by, this Decision and Order.  Defendants are directed to file an answer to Plaintiff's complaint within **FOURTEEN (14) DAYS** after the filing of the Amended Complaint.  This case is referred back to Magistrate Judge Peebles for the setting of pretrial deadlines.

Dated: August 29, 2016
      Syracuse, New York

                    Hon. Glenn T. Suddaby
                    Chief U.S. District Judge